# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
**DEBORAH DOUGLAS-SLADE,**                  )
                                            )
         **Plaintiff,**                )
                                            )
   **v.**                                   )     **Civil Action No. 10-0850 (ESH)**
                                            )
**RAY H. LaHOOD, Secretary,**               )
**U.S. Department of Transportation,**      )
                                            )
         **Defendant.**                )
_____ )

## MEMORANDUM OPINION

Plaintiff brings this employment discrimination action under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, *see* 42 U.S.C. § 2000e-5(f)(1), against the Secretary of Transportation. This matter is before the Court on the parties' cross-motions for summary judgment.[1] For the reasons discussed below, summary judgment will be granted for defendant.

## I. BACKGROUND

Plaintiff, an African-American female, Defendant's Memorandum of Points and Authorities in Support of [his] Motion to Dismiss and for Summary Judgment and Defendant's Opposition to the Plaintiff's Motion for Summary Judgment ("Def.'s Mem."), Ex. 1 (Transcript of EEO Hearing on February 17, 2009) at 7:13-14, began 27-year career in the federal service in 1980, *see* Plaintiff's Opposition to Defendant's Motion to Dismiss and for Summary Judgment

---

[1] Defendant moves to dismiss and for summary judgment. However, because "matters outside the pleadings are presented to and not excluded by the court," his motion to dismiss under Rule 12(b)(6) "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Plaintiff's motion for summary judgment will be denied for its failure in format and substance to comply with Fed. R. Civ. P. 56 and LCvR 7(h).

and Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), Ex.

139 at 3.[2]  At all times relevant to the complaint, she was a Computer Specialist with the Federal

Aviation Administration ("FAA"), a component of the United States Department of

Transportation ("DOT").  Compl., Attach. (Decision, EEOC No. 570-2007-00837X dated April

2, 2009) ("EEO Decision") at 2.  In September 2005, after she had "received the Department of

Transportation Secretary Award," Def.'s Mem., Ex. 1 at 34:12-13, plaintiff was "promoted . . . to

the 'K' pay band, which is similar to a GS-15 level of pay and responsibility."  Compl., Attach.

(EEO Decision) at 2; Def.'s Mem., Ex. 1 at 36:16-18; Pl.'s Opp'n, Ex. 143 (Notification of

Personnel Action effective September 18, 2005).  The GS-15 level is at the top of the federal

civilian pay scale.  *See* Def.'s Mem., Ex. 1 at 148:16-21.

**Section 508 Program**

Between April 2001 and March 2007, plaintiff "was solely responsible for the [FAA's

Section] 508 [P]rogram," which, pursuant to Section 508 of the Rehabilitation Act, *see* 29 U.S.C.

§ 794(d), was designed "to eliminate barriers in the Federal government in electronic and

information technology for individuals with disabilities."  Compl., Attach. (EEO Decision) at 2

n.3; *see* Def.'s Mem., Ex. 1 at 33:6-12, 280:1-8.  In September 2005, plaintiff "identified and set

her annual performance goals" for the following fiscal year, "encompassing the period of

October 1, 2005, through September 30, 2006 ('FY 2006')."  Compl., Attach. (EEO Decision) at

2; Def.'s Mem., Ex. 1 at 44:7-16, 142:5-143:3; Pl.'s Opp'n, Ex. 147 (Performance Plan).  For

---

[2]Defendant has submitted a transcript of the two-day hearing before an Administrative
Law Judge of the Equal Employment Opportunity Commission.  *See* Def.'s Mem., Ex. 1.
References to the transcript of proceedings on the second day,  February 18, 2007, are designated
"Vol. 2."

that time period, among other goals, plaintiff was to ensure that 80% of the FAA's 321 registered websites were Section 508 compliant by September 30, 2006. Compl., Attach. (EEO Decision) at 2; Def.'s Mem., Ex. 1 at 50:13-15, (Vol. 2) 170:1-10; Pl.'s Opp'n, Ex. 147 at 3.

The FAA "is driven by . . . the flight plan, which is an overall compendium of business unit goals and objectives." Def.'s Mem., Ex. 1 (Vol. 2) at 163:16-19. In order to mark the progress of a particular business unit's goals (monthly reports of which are "rolled up to the [FAA] [A]dministrator's flight plan," *id.*, Ex. 1 at 287:9-10), the agency uses a three-tier color-coded rating system. Compl., Attach. (EEO Decision) at 3; Def.'s Mot., Ex. 1 at 288:3-11, (Vol. 2) at 171:9-12. Green "means programs are on track and appear to be on track to achieve the targets of the goal, including monthly targets." Def.'s Mot., Ex. 1 at 288:12-14, (Vol. 2) 171:18-20. "Yellow means that the programs are starting to slip and there's a potential for not accomplishing the goals," and "red means in very high probability the program will not meet the targets for the year so it's virtually failing." *Id.*, Ex. 1 at 288:15-20, (Vol. 2) 171:20-172:3. The FAA's executive management, including the Administrator, reviewed the flight plans. *Id.*, Ex. 1 at 288:1-2. Plaintiff led the Section 508 Program, and she was responsible for determining the color rating for its progress. *Id.*, Ex. 1 at 289:17-290:1. She also was responsible for submitting monthly reports of the program's progress to her supervisor. *Id.*, Ex. 1 at 290:4-9. The color coded rating system "is not mentioned in [plaintiff's] performance standards." *Id.*, Ex. 1 at 50:9-10.

Diana Young became plaintiff's supervisor in February 2006. Def.'s Mem., Ex. 1 at 125:6-8. After supervising plaintiff for approximately five weeks, on April 2, 2006, she conducted a mid-year review of plaintiff's performance. *Id.*, Ex. 1 at 37:17-19, 282:21-16.

Plaintiff's performance was not rated at that time; the purpose of the review was to have "a deep discussion about [her] performance objectives, . . . [her] progress, . . . the challenges facing [her] and [whether] any other adjustments have to be made." *Id.*, Ex. 1 at 284:5-10. According to plaintiff, Ms. Young "indicated everything was excellent." *Id.*, Ex. 1 at 37:21-38:4. According to Ms. Young, although "the program was lagging behind in some of the performance metrics this was to be expected [and] they normally recover very quickly and get right back on track." *Id.*, Ex. 1 at 284:13-17. Plaintiff "fully expected to achieve her goals," *id.*, Ex. 1 at 286:8-9, and she did not request additional assistance at that time. *See id.*, Ex. 1 at 286:4-22.

In April 2006, however, Ms. Young noticed that "the numbers between the targets [the Section 508 Program] was supposed to be meeting and the levels of compliance didn't quite match up," meaning that the program was "slipping further behind." *Id.*, Ex. 1 at 294:11-13, 15-16. A dispute arose between plaintiff and Ms. Young regarding the compliance data for the Section 508 Program. According to Ms. Young, plaintiff "was reporting the numbers in terms of total websites and total . . . 508 compliance compared to the total websites." *Id.*, Ex. 1 at 295:3-6. The FAA target "was to the total – 80 percent of the websites would be 508 compliant." *Id.*, Ex. 1 at 295:7-9. Plaintiff apparently "refused to . . . translat[e] her total numbers or raw numbers to the target numbers of the flight plan," *id.*, Ex. 1 at 295:14-17, using a formula Ms. Young provided, *see id.*, Ex. 1 at 295:19-296:1. According to plaintiff, Ms. Young's reporting was unethical and dishonest, *see id.*, Ex. 1 at 164:4-12, 296: 2-3, because it misrepresented the program's performance. *See id.*, Ex. 1 at 175:1-5.

To address these reporting discrepancies, Ms. Young called meetings with plaintiff and her support team, Def.'s Mem., Ex. 1 at 298:3-4, and encouraged them to work with others in the

agency responsible for managing systems and databases. *See id.*, Ex. 1 at 299:8-20. In addition, plaintiff and Ms. Young had other meetings and e-mail exchanges. *Id.*, Ex. 1 at 301:4-8. In Ms. Young's view, plaintiff was "aggressively . . . resent[ful] of [her] dialogue . . . or . . . e-mail communications," *id.*, Ex. 1 at 302:7-9, while plaintiff continued to accuse Ms. Young of being dishonest. *Id.*, Ex. 1 at 302:20-303:2. Plaintiff "had problems with [Ms. Young] coming in[to her office] and wanting to meet with [her] all of the time," *id.*, Ex. 1 at 164:16-17, and she particularly felt uncomfortable meeting with Ms. Young alone. *See id.*, Ex. 1 at 53:3-6. According to Ms. Young, plaintiff "became increasingly of a stance that [she] need not tell [plaintiff] how to run the program[.] [I]t was becoming progressively a problem of communication. [Plaintiff] was pulling back further and further and less cooperative." *Id.*, Ex. 1 at 302:9-14.

The Section 508 Program was in the red for the months of May and June 2006. Def.'s Mem., Ex. 1 at 235:13-18. Even as the program's progress continued to deteriorate through July, *id.*, Ex. 1 at 303:3-304:14, at no time did plaintiff change her approach. *Id.* at 304:15-18, 306:8-15. Instead, plaintiff adopted the same approach taken in the prior year, which meant that "when the program falls behind," plaintiff would "go to senior management to solve the problem," *id.*, Ex. 1, at 304:22-305:2. Ms. Young believed that a GS-15 employee "is supposed to handle and manage very high complex programs or initiatives," *id.*, Ex. 1, at 305:13-15, and be a "highly skilled problem solver[]," *id.*, Ex. 1, at 305:17-18, who can "come up with solutions and recommendations on how to solve [a] problem," *id.*, Ex. 1, at 20-21. In her view, plaintiff's strategy "didn't effectively get [the program] to the performance targets." *Id.*, Ex. 1, at 306:14-15.

By July 2006, plaintiff "wasn't communicating at all anymore" with Ms. Young, *id.* at 307:8-9, and the program's performance continued to worsen. *Id.*, Ex. 1, at 307:18-308:1. As of July 14, 2006, 80 websites (25%) were Section 508 compliant; as of August 11, 2006, 87 websites (27%) were 508 compliant; as of September 1, 2006, 100 agency websites (31%) were 508 compliant. Compl., Attach. (EEO Decision) at 2-3. The Section 508 Program was reported as red in the FAA's flight plan each month from October 2005 through August 2006, Compl., Attach. (EEO Decision) at 3, and was reported as red for Fiscal Year 2006. Def.'s Mem., Ex. 1, at 235:13-18, 340:17-342:16.

### Leave Restriction

Agency policy required that an employee request leave in advance except in an emergency situation. *See* Def.'s Mem., Ex. 1, at 308:16-18. In or around May 2006, plaintiff's "leave usage was incredible." *Id.*, Ex. 1, at 308:10-11. Rather than arranging to use leave in advance, plaintiff typically left Ms. Young a voicemail message around 4:00 or 4:30 a.m. requesting unscheduled leave. *Id.*, Ex. 1, at 309:1-4, 311:15-312:12. Ms. Young tracked plaintiff's leave usage, as she did with other employees, *id.*, Ex. 1, at 309:7-10, and observed that plaintiff used unscheduled leave to "extend[] her weekends and . . . wasn't planning her time," *id.*, Ex. 1, at 313:22-314:1, instead "just . . . deciding not to come in." *Id.*, Ex. 1, at 314:1-2.[3]

---

[3]Plaintiff was on an alternative work schedule, and had one day off every other week during a two-week period. *See* Def.'s Mem., Ex. 1, at 219:16-220:10. In addition to her regular day off, plaintiff "took a lot of Mondays and Fridays off, it was a pattern, unscheduled leave." *Id.*, Ex. 1 (Vol. 2) at 133:1-2. "Between May 13, 2006, and June 10, 2006, [plaintiff] excessively used unscheduled annual leave, reducing her available annual leave balance to approximately seven hours, and similarly used sick leave thereby completely reducing all available sick leave, ending with a negative sick leave balance." Compl., Attach. (EEO Decision) at 3.

For example, during May 2006, plaintiff was in the office only fifty percent of the time.  *Id.*, Ex. 1, at 315:9-11.  These unscheduled absences occurred during the period when the Section 508 Program's performance was failing.  *Id.*, Ex. 1, at 314:3-10.

On June 12, 2006, Ms. Young discussed with plaintiff her use of unscheduled leave and directed her to observe agency policy by requesting leave in advance.  Def.'s Mem., Ex. 1, at 96:14-15; 315:12-316:4.  According to Ms. Young, plaintiff "didn't think she needed to adhere to the [leave] policies [because] she got her work done and it wasn't a problem."  *Id.*, Ex. 1, at 317:6-8.  Shortly thereafter, Ms. Young denied one leave request.  *See id.*, Ex. 1, at 227:10-13; *see also id.*, Ex. 8 (Memorandum to plaintiff from Ms. Young dated August 25, 2006) at 11.  Although plaintiff submitted her request three days in advance, on Monday, July 19, 2006, for leave on Thursday, July 22, 2006 (the day before her regular day off), Ms. Young denied the request because the office was short-staffed due to preapproved leave granted to two other employees, and because of her concerns about the Section 508 Program's performance.  *Id.*, Ex. 1, at 318:9-22.  Plaintiff apparently attributed the denial of leave to "personality or other issues," *id.*, Ex. 8, at 11, and expressed her lack of "desire to be in an environment that is hostile and counterproductive."  *Id.*, Ex. 1 (Vol. 2) at 114:9-11.  A subsequent series of e-mail messages regarding plaintiff's requests for leave evidenced the continued deterioration of the relationship between plaintiff and Ms. Young, *see id.*, Ex. 1, at 322:16-324:11, and "upon this e-mail trail . . . [plaintiff] was immediately claiming a hostile work environment," *id.*, Ex. 1, at 325:9-12, and requested a transfer.  *Id.*, Ex. 1, at 325:12-13.

Plaintiff "felt uncomfortable" with Ms. Young, *id.*, Ex. 1, at 164:18-19, and she thought that Ms. Young "had a slight-of-hand way of management . . . say[ing] one thing and do[ing]

another." *Id.*, Ex. 1, at 164:21-22; *see id.*, Ex. 1, at 173:7-20.  In addition, plaintiff "was uncomfortable" with Ms. Young "because she is a Lesbian." *Id.*, Ex. 1, at 168:3-4.  Moreover, plaintiff "didn't like the way [she] felt when [she] was around [Ms. Young]," in part because Ms. Young supposedly "was aggressive . . . like a man – and [plaintiff] didn't . . . care for that." *Id.*, Ex. 1, at 168:8-14.  Generally, plaintiff disapproved of Ms. Young's "whole way of micromanaging" her and "not really giving [her] the opportunity to execute the program as [she] had always done in the past." *Id.*, Ex. 1, at 173:18-18.  Further, plaintiff considered Ms. Young to be "rude and disrespectful," and prone to react over "petty things." *Id.*, Ex. 1, at 120:10-11.  Plaintiff felt she "didn't need [Ms. Young] hovering around." *Id.*, Ex. 1, at 173:18-19.

On June 21, 2006, plaintiff sought a meeting with Ms. Young's supervisor in order "to inform him of her peculiar management style." *Id.*, Ex. 1, at 53:9-10.  On the supervisor's advice, plaintiff and Ms. Young participated voluntarily in an alternative dispute resolution session on July 24, 2006.  *See id.*, Ex. 1, at 94:16-18, 206:20-208:11, 325:6-20.  Ms. Young hoped to "deal with the issues [they] were having from the program standpoint, what [they might] do to get it back on track [and] deal with issues around attendance." *Id.*, Ex. 1, at 326:4-6.  At that meeting plaintiff "introduced . . . 13 examples or situations where [she] felt that [Ms. Young] was being unethical, deceptive – questioning her ethics – managing by slight of hand." *Id.*, Ex. 1, at 94:22-95:3; *see generally* Pl.'s Opp'n, Ex. 107.  She sought reassignment to another manager, and her request was denied.  Def.'s Mem., Ex. 1, at 95:10-13.  Although the parties discussed plaintiff's leave usage during that meeting, *id.*, Ex. 1, at 209:22-211:1, apparently they reached no resolution of issues pertaining to the Section 508 Program's performance.  *See id.*, Ex. 1, at 210:11-12, 211:2-6.  Overall the meeting was unsuccessful, *see id.* at 326:9-18; 328:4-7,

leaving Ms. Young "with this program that was failing with no recourse," while plaintiff "was more and more distant." *Id.*, Ex. 1, at 327:1-3.

On August 14, 2006, Ms. Young placed plaintiff on leave restriction for a period of one year. Def.'s Mem., Ex. 1, at 331:13-20; *see id.*, Ex. 7 (Memorandum from D.C. Young to plaintiff dated August 14, 2006). Ms. Young informed plaintiff that her "frequent unscheduled absences ha[d] disrupted the efficient operation of the office and at times burdened the other members of the staff with additional work." *Id.*, Ex. 7 at 1. She found that "careful review of [plaintiff's] leave usage has revealed a pattern of unscheduled leave which . . . [was] considered unsatisfactory in view of [her] overall attendance record." *Id.* That plaintiff "took a lot of Mondays and Fridays off" and "didn't . . . put in leave slips prior to approval" were "reasons for placing [her] on a leave restriction letter." *Id.*, Ex. 1 (Vol. 2) at 133:1-5. The leave restriction required that plaintiff (1) request and obtain approval for scheduled annual and sick leave at least two days in advance; (2) personally contact Ms. Young or her designee within one hour after the start of her work day in cases of emergency when leave cannot be scheduled in advance; and (3) submit a medical certificate for all unscheduled sick leave. *Id.*, Ex. 7 at 1-2. Failure to abide by these conditions would "result in [plaintiff] being charged Absence Without Leave (AWOL)." *Id.*, Ex. 7 at 2. Plaintiff was "devastated" and "shocked" by the leave restriction. *Id.*, Ex. 1, at 99:2.

Subsequently, Ms. Young denied plaintiff's request for leave on August 21, 2006, noting that the Section 508 Program had "been red since May and [plaintiff] needed to concentrate more time and effort on the successful completion of her program goals." *Id.*, Ex. 1, at 333:2-5; Pl.'s Opp'n, Ex. 146-B (Request for Leave or Approved Absence dated August 15, 2006). Plaintiff

interpreted these events "as pretext to discrimination and an act of reprisal." *Id.*, Ex. 1, at 333:16-17; *see id.*, Ex. 1, at 336:3-11.

On one occasion, Ms Young placed plaintiff on AWOL status. On the morning of February 26, 2007, plaintiff called in to report that she had a "scratchy throat," Def.'s Mem., Ex. 1, at 201:9-16, and left a voicemail message for Ms. Young to request sick leave for the day. *Id.*, Ex. 1, at 201:19-202:4; 350:1-7. However, due to inclement weather, the Office of Personnel Management later authorized liberal leave on that day. *Id.*, Ex. 1, at 202:16. When plaintiff arrived at work the next day, she submitted a leave slip without "any notation or reference – or . . . doctor's note . . . substantiating her leave." *Id.*, Ex. 1, at 351:2-5. Plaintiff was not allowed to claim annual leave after first requesting sick leave; without a preapproved leave request or a doctor's note, plaintiff had not complied with the terms of the leave restriction. *Id.*, Ex. 1, at 351:6-10, 352:15-22; Pl.'s Opp'n, Ex. 154 (e-mail message to plaintiff from Ms. Young dated March 6, 2007). Plaintiff deemed this action "draconian" and considered it "apparent that [Ms. Young's] hostility and reprise against [her] continue[d]." Pl.'s Opp'n, Ex. 154 (e-mail message to Ms. Young from plaintiff dated March 6, 2007).

### EEO Complaint

Two days after the unsuccessful alternative dispute resolution meeting, plaintiff "chose to go down the EEO process," Def.'s Mem., Ex. 1, at 326:20-21, by filing an EEO complaint on July 26, 2006, alleging discrimination based on race, sex, and reprisal. *Id.*, Ex. 3 (Complaint of Discrimination in the Federal Government, No. 2006-20690-FAA-02). Plaintiff "decided that she needed to file a discrimination complaint based on disparate treatment, retaliation and hostile environment," on the belief that Ms. Young "was going to retaliate." *Id.*, Ex. 1, at 96:2-4, 8.

10

Plaintiff asserted that Ms. Young created an "extremely hostile" work environment, Ex. 1, at 197:5, and that this alleged hostility escalated after she filed her EEO complaint. *Id.*, Ex. 1, at 197:16-17. Further, plaintiff thought that Ms. Young was trying to "sabotage [the 508 Program] and interfere with it," *id.*, Ex. 1, at 197:19, and "had a vendetta" against her because she "had filed an EEO complaint." *Id.*, Ex. 1, at 199:4-5; *see id.*, Ex. 1, at 201:7.

Accepted for investigation was the following issue:

> [Was plaintiff] subjected to harassment (hostile work environment) based on [her] **race** (African American), **sex** (female) and **retaliation** (EEO activity) by management beginning in July 2006?

Def.'s Mem., Ex. 4 (Letter from T.L. Wright, Regional Director, Departmental Office of Civil Rights, U.S. Department of Transportation) (emphasis in original).

**Opportunity to Demonstrate Performance ("ODP")**

Monthly progress goals had been established for achieving Section 508 compliance for the agency's registered websites, from 5% compliance in October 2005 to 100% compliance by September 2006. Def.'s Mem., Ex. 8, at 5. For the month of July 2006, according to Ms. Young, plaintiff underreported the monthly compliance level (27% instead of 33%); at either level the program was failing and therefore was reported red. *Id.*, Ex. 8, at 12. By the end of August 2006, roughly one month before the end of the reporting cycle, the Section 508 Program still was reported red. *Id.*, Ex. 1, at 339:13-18.

On August 25, 2006, Ms. Young notified plaintiff of her "fail[ure] to meet the performance expectations of [her] position of Computer Specialist." *Id.*, Ex. 8, at 1. Accordingly she prepared an Opportunity to Demonstrate Performance ("ODP") plan, an 18-page memorandum in which Ms. Young described plaintiff's performance deficiencies in great

detail.  *See generally id.*  For example, with respect to reporting the Section 508 Program's

performance, Ms. Young wrote:

> You have consistently refused to meet reporting requirements for
> monthly flight plan/business plan targets.  In early May, I tried to
> get you to report on the specifics of flight plan targets and you
> couldn't make the translation from total program measures to that
> of the monthly targets.  I explained the difference between what
> you reported and what else was required.  I provided you with
> formulas to compute the target numbers and provided you with a
> reporting structure that included total program statistics as well as
> a clearly articulated translation to the actual target Flight
> Plan/Business Plan measures.  You do not appear to grasp the
> significance of specific requirements nor do you seem to realize
> the importance of complete and meaningful reporting.
>
> * * *
>
> When asked to provide strategies and alternate[] strategies to get
> back to green, your initial response was the same as all year . . ..
> With no apparent alternate thinking, I asked for a strategy with
> very detailed action plan to get back to yellow and then to green.  I
> specified in a single document – you provided three separate
> documents, two of which were prior reports and contained
> inconsistent data values, and the combined documents lacked
> clarity, organization and specificity demonstrating a failure to meet
> reporting requirements including failure to prepare a basic project
> plan.
>
> * * *
>
> Based on the RED status of your program, you were required to
> submit a weekly status report containing very specific progress
> metrics and status areas of progress reporting to update weekly.
> You refused to include all the metrics, you provided little evidence
> of tang[ib]le work activities, very little change in status area
> updates from week to week, very little progress shown in
> achieving goal, and continued to require the [Chief Information
> Officer] to solve your challenges.  Very little tangible evidence of
> work shown on your part to achieve goals – but you did discovery
> on July 25, that the DOT server was down.  It had been down for at
> least 4 weeks by that point, why were you just finding this out?

*Id.*, Ex. 8, at 3-4. Among other goals, the Section 508 Program was to achieve 80% compliance

(that is, 80% of the agency's 321 registered websites) by the end of Fiscal Year 2006, *see id.*, Ex.

8, at 5, and Ms. Young described at length the progress, or lack thereof, in reaching monthly

targets from January through July 2006. *See generally id.*, Ex. 8, at 5-12. For instance, Ms.

Young asked plaintiff to provide a "[s]trategy for obtaining green," and she described the

response as "insufficient, non responsive and [it] revealed no desire to do any creative thinking."

*Id.*, Ex. 8, at 12. She described plaintiff's responses to further inquires and assignments as

"unprofessional," and documents submitted at Ms. Young's request "neither individually nor in

total provide[d] a cohesive strategy, action plan or any new or alternate thinking or solutions."

*Id.* If Ms. Young were to rate plaintiff's performance, plaintiff would have received a "Does

Not Meet Expectations" rating. *Id.*, Ex. 8, at 13.

Ms. Young came to the conclusion that plaintiff was not working at a GS-15 level, *see*

Def.'s Mem., Ex. 1 (Vol. 2) at 26:11-20; 28:17-19, and the ODP gave plaintiff an opportunity to

"demonstrate and improve [her] performance." *Id.*, Ex., 1, at 339:11-12. The ODP set forth the

performance expectations of plaintiff's position and the outcomes which would demonstrate

satisfactory performance for a 90-day period ending on November 30, 2006. *See generally id.*,

Ex. 8

Plaintiff "was infuriated" by the ODP, Def.'s Mem., Ex. 1, at 339:21, and responded by

preparing a lengthy document of her own. *See* Pl.'s Opp'n, Ex. 111 at 3-15. She considered it

"unjustified," Def.'s Mem., Ex. 1, at 101:22, and believed it to be "designed to set [her] up for

failure." *Id.*, Ex. 1, at 102:1. Overall, for plaintiff the "ODP process . . . created anxiety and

feelings of discomfort." Pl.'s Opp'n, Ex. 117 at 2. In plaintiff's estimation, the ODP was just

another way "to destroy [her] career." Def.'s Mem., Ex. 1, at 103:17. Furthermore, because of the ODP, plaintiff was not eligible for bonus pay (organizational success increase or superior contribution increase) or voluntary early retirement. *Id.*, Ex. 1, at 111:3-11, 199:22-200:18, (Vol. 2) 160:15-161:21; *id.*, Ex. 9 (Memorandum from D.C. Young to plaintiff dated January 26, 2007). And the ODP was "a negative statement in [her] official . . . file . . . which would hinder [her] ability to" obtain a position in the Senior Executive Service ("SES"), *id.*, Ex. 1, at 111:14-15, a position to which she aspired before she allegedly "was forced out of the government." *Id.*, Ex. 1, at 31:7-9.

Ms. Young acknowledged plaintiff's hard work and improvement during the ODP period; she also noted areas of poor performance. *See generally* Pl.'s Opp'n, Ex. 116 (OPD Review). Plaintiff received a "Meets Expectations" rating for the period ending September 30, 2006. Def.'s Mem., Ex. 9. At that point, Ms. Young offered plaintiff three options regarding her future employment. First, plaintiff could "either retain [her] current grade level [and] assume additional responsibilities . . . commensurate with that high grade level," *id.*, Ex. 1, at 344:12-15, or "take a voluntary downgrade to a J-band or a [GS-]14 and just stay strictly focused only on . . . the 508 [P]rogram." *Id.*, Ex. 1, at 334:20-345:1.[4] Plaintiff considered the latter a demotion. *Id.*, Ex. 1, at 242:12-14. A third option was a detail to another office within the DOT.[5] *See id.*,

---

[4]Plaintiff had made it known that she intended to sell her District of Columbia residence, leave federal service, and move to Farmville, Virginia. *See* Def.'s Mem., Ex. 1, at 125:13-126:7; *id.* (Vol. 2) at 92:18-22. Ms. Young had this "in mind, knowing that at any time [plaintiff] would be leaving," *id.*, Ex. 1 (Vol. 2) at 21-22, and "offered [plaintiff] the option to voluntarily take a downgrade," *id.*, Ex. 1 (Vol. 2) at 93:2-3, rather than have plaintiff "assume the additional responsibilities that are expected" of a GS-15 employee. *Id.*, Ex. 1 (Vol. 2) at 92:22-93:2.

[5]It appears that the detail available to plaintiff would have required her to report to a GS-
(continued...)

Ex. 1, at 345:8-346:2.[6]  Although plaintiff "was quite excited" about the prospect of a detail, *see id.*, Ex. 1, at 347:16-348:9, she was not pleased to "remain under [Ms. Young's] management authority."  *Id.*, Ex. 1, at 112:21-22.[7]  Plaintiff was informed on March 22, 2007, that a detail had been approved, *id.*, Ex. 1, at 30:2-3, and on the next day she resigned.  *Id.*, Ex. 1, at 30:4-6, 348:9-11.  In her resignation letter, plaintiff stated:

> At this point in my career, I have come to the conclusion that it is best that I remove myself from my present work environment.  It is humiliating, stressful and nonconducive to any reasonable efforts to reconcile the issues that have been identified in my EEO complaint.
>
> * * *
>
> The tension I am feeling and the isolation I am subjected too [sic] is pushing me to despair.  Therefore, I must take this extreme action in order to preserve my health and welfare.
>
> I trust that my EEO complaint will proceed on schedule and eventually I will receive the justice I am due.

---

[5](...continued)
13 employee, Def.'s Mem., Ex. 1 (Vol. 2) at 97:20-98:1, which in plaintiff's estimation was " a demotion . . . that was like execution as far as [her] career was concerned."  *Id.*, Ex. 1, at 112:8-10.  Plaintiff saw "no career advancement" with the detail, with "nothing there for [her] . . . to learn or to achieve by working for a [GS-]13."  *Id.*, Ex. 1, at 113:4-7.  After all, plaintiff "was already a lead on [her] own program."  *Id.*, Ex. 1, at 113:7.

[6]Ms. Young and her supervisors also had explored a fourth "option of potentially reassigning [plaintiff] to a project at the tech center in New Jersey," which meant "a mandatory relocation" for plaintiff.  Def.'s Mem., Ex. 1, at 346:17-21.  If plaintiff faced mandatory relocation, it was thought that she would have been eligible for early retirement; this turned out not to be a viable option because the Office of Personnel Management was unlikely to approve the early retirement.  *Id.*, Ex. 1, at 347:2-9; *see id.*, Ex. 1 (Vol. 2) at 94:10-96:19.

[7]An employee who is detailed elsewhere returns to the original manager, such that plaintiff would have had "no relief from [Ms. Young] under any of those three options" presented to her at the end of the ODP.  Def.'s Mem., Ex. 1, at 114:4-5.

Def.'s Mem., Ex. 10 (Memorandum to Personnel Specialist Gale Harrell from plaintiff dated March 23, 2007). Plaintiff believed that she "was forced to leave" federal service, *id.*, Ex. 1, at 115:14, since Ms. Young "took on this vengeful approach . . . because [she] had filed that EEO complaint." *Id.*, Ex. 1, at 115:19-22. Plaintiff stated that she "just couldn't stay . . . and be subject[ed] to more hostility and humiliation." *Id.*, Ex. 1, at 116:15-17.

After plaintiff resigned, Ms. Young reassigned the Section 508 Program responsibilities to a GS-13 employee, and since then the program has not been reported red. Def.'s Mem., Ex. 1, at 353:16-354:21.

## EEOC Proceedings

The investigation of plaintiff's discrimination complaint continued after her resignation. *See* Compl., Ex. 3 (Letter to plaintiff from K.E. Klotz, Departmental Office of Civil Rights, Office of the Secretary, DOT, dated April 9, 2007, regarding DOT Complaint #2006-20690-FAA-02). Plaintiff requested a hearing before the Equal Employment Opportunity Commission ("EEOC"), *id.*, Ex. 7 (Letter from plaintiff to EEOC dated August 9, 2007), after which the EEOC directed the agency to submit its Report of Investigation. *Id.*, Ex. 9 (Order Directing Agency to Produce Complaint File, EEOC No. 570-2007-00837X, Agency No. 2006-20690-FAA-02, dated August 31, 2007).[8] After a two-day hearing, *see* Def.'s Mem., Ex. 1, the Administrative Law Judge ("ALJ") ruled in favor of the agency. *See* Compl., Attach. (Order Entering Judgment dated April 2, 2009). Plaintiff unsuccessfully appealed this determination to the EEOC's Office of Federal Operations. *See id.*, Attach. (Decision, Appeal No. 0120092627, dated October 29, 2009, and Denial, Request No. 0520100109, dated May 6, 2010).

---

[8]Neither party has submitted a copy of the Report of Investigation.

## II. DISCUSSION

**A.      Summary Judgment Standard**

Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure.  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R .Civ. P. 56(a).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion

by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits
> or declarations, stipulations (including those made for purposes of the
> motion only), admissions, interrogatory answers, or other materials);
> or
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may ...

consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).  When

considering a motion for summary judgment, the court may not make credibility determinations

or weigh the evidence; the evidence must be analyzed in the light most favorable to the

nonmoving party, with all justifiable inferences drawn in his favor.  *Anderson v. Liberty Lobby*,

Inc., 477 U.S. 242, 255 (1986).  "If material facts are at issue, or, though undisputed, are

susceptible to divergent inferences, summary judgment is not available."  *Moore v. Hartman*,

571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).  The mere existence of a factual dispute does

not bar summary judgment.  *See Liberty Lobby*, 477 U.S. at 248.  "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on conclusory assertions without any factual basis in the record to create a genuine dispute. *See Ass'n of Flight Attendants–CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).

## B.     Allegations Regarding the Report on Investigation and EEOC Proceedings

Plaintiff devotes a great deal of her complaint and opposition to defendant's dispositive motion to errors and irregularities with respect to the investigation of her discrimination claims at the administrative level, *see* Compl. at 2, 5; *see generally* Pl.'s Opp'n to Def.'s Mot. to Dismiss and for Summ. J. & Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Dkt. #18] ("Pl.'s Opp'n"), the ALJ's rulings on discovery and evidentiary matters, *see* Compl. at 2, 4-5, and his ultimate decision on her claim. *See id.* at 5-6. She alleges that "[t]he entire Equal Employment Opportunity process was not conducted in accordance to the federal laws that are put in place under 29 CFR 1614," thus depriving her of "a fair and thorough investigation" of her claims." *Id.* at 6. These claims are not actionable under Title VII, which "creates only a cause of action for discrimination[,] . . . not . . . an independent cause of action for the mishandling of an employee's discrimination complaints." *Young v. Sullivan*, 733 F .Supp. 131, 132 (D.D.C. 1990); *Wilson v. U.S. Dep't of Transp.*, 759 F. Supp. 2d 55, 62 (D.D.C. 2011) (dismissing allegations "that Defendants somehow mishandled [plaintiff's] Title VII complaint . . . [because it] does not state a viable legal claim"); *see Nelson v. Greenspan*, 163 F. Supp. 2d 12, 18 (D.D.C. 2001) (dismissing claim that defendant failed to follow proper procedure in the processing of

discrimination complaints which ultimately resulted in settlement agreement); *Hill v. England*, No. CVF05869, 2005 WL 3031136, at *2 (E.D. Cal. Nov. 8, 2005) (dismissing "allegations concerning the handling of plaintiff's EEO complaints by Navy personnel"); *see also Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) (concluding that neither delay in issuance of final decision nor staff's refusal to cooperate with an EEOC investigation was an adverse action for purposes of Title VII).

The remaining claims appear to be discrimination based on race and sex, retaliation, hostile work environment, and constructive discharge.

**C.     Race, Sex, and Retaliation**

"Title VII prohibits the federal government from discriminating in employment on the grounds of race or sex, . . . and from retaliating against employees for engaging in activity protected by Title VII."  *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) (citations omitted); *see Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (stating that the "general ban on retaliation in [42 U.S.C.] § 2000e-3(a)" applies to federal employers through 42 U.S.C. § 2000e-16).   In a case such as this where plaintiff points to no direct evidence of discrimination and instead relies on circumstantial evidence, "the familiar *McDonnell Douglas* framework applies."  *Montgomery*, 546 F.3d at 706; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  "First, the plaintiff must establish a prima facie case of discrimination," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citations omitted), and if she does so, the burden shifts to the employer to demonstrate a "legitimate, nondiscriminatory reason" for its actions, *id.*  "[T]he sole remaining issue," then, is "discrimination vel non."  *Id.* (internal quotation marks and citation omitted).  "The court can

resolve that question in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case – here that her employer took a materially adverse action against her." *Taylor v. Solis*, 571 F.3d 1313, 1320 n.1 (D.C. Cir. 2009).

The parties do not dispute that plaintiff is a member of a protected class and that she engaged in protected activity by filing a charge of discrimination in July 2006. Defendant argues that "the primary claims about which the plaintiff complains, *i.e.*, the ODP and the leave restriction letter, . . . fail because they do not constitute adverse employment actions." Def.'s Mem. at 36. Even if these actions were adverse, defendant argues that there were legitimate, non-discriminatory reasons for them which plaintiff failed to rebut. *See id.* at 38-40.

### 1.      Race and Sex Discrimination

"[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of [her] race [or] color . . .." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). "A plaintiff must prove both elements to sustain a discrimination claim." *Baloch*, 550 F.3d at 1196. Although plaintiff asserted race and sex as bases for her EEO complaint, *see* Def.'s Mem., Ex. 3, nowhere in her complaint does she mention race or sex. *See generally* Compl. It is not enough that she allege to "have been subjected to discrimination." Compl. at 1. Absent "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and in light of plaintiff's utter failure to point to any evidence in the record to support a claim of discrimination based on her race or sex, these claims must fail. *See Andrum v. Washington Metro. Area Transit Auth.*,

710 F. Supp. 2d 112, 119-20 (D.D.C. 2010) (granting summary judgment for employer where plaintiff "has not presented a single argument or piece of evidence" that the employer enforced a policy based on plaintiff's race); *Bloch v. U.S. Census Bureau*, 754 F. Supp. 2d 15, 18 (D.D.C. 2010) (dismissing age and gender discrimination claims where the plaintiff "has not stated any facts to support either [claim]").

## 2. Retaliation

"In order to prevail upon a claim of unlawful retaliation, an employee must show she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her." *Porter v. Shah*, 606 F.3d 809, 817 (D.C. Cir. 2010) (quoting *Taylor*, 571 F.3d at 1320); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Generally, an employment action "does not support a claim of discrimination unless it has 'materially adverse consequences affecting the terms, conditions, or privileges of [the plaintiff's] employment . . . such that a reasonable trier of fact could find objectively tangible harm.'" *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)). For example, an action effecting "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," *Aliotta v. Bair*, 576 F. Supp. 2d 113, 120 (D.D.C. 2008) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)), *aff'd*, 614 F.3d 556 (D.C. Cir. 2010), may be considered an adverse employment action. The concept is more broad in a retaliation case, however, such that an employment action is materially adverse if it "could well dissuade a reasonable worker from making or supporting a

charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *see Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008).

### a.      Leave Restriction

Plaintiff alleges that the leave restriction was imposed in retaliation for her having filed an EEO complaint in July 2006.  Defendant counters that the leave restriction "did not have any effect on her pay and benefits," and that it "did nothing more than institute what [was] an established policy of having an employee obtain approval from her employer to take leave in advance."  Def.'s Mem. at 37.  Therefore, defendant argues, the leave restriction was a "merely routine personnel action[] that would not dissuade a reasonable person from participating in the EEO process."  *Id.*

Plaintiff's submission is replete with references to the leave restriction as an adverse action, yet she fails to articulate any basis from which the Court may conclude that it either affected the terms or conditions of her employment or would have dissuaded a reasonable employee from pursuing an EEO claim.  The Court concludes, then, that the leave restriction did not qualify as an adverse action sufficient to sustain plaintiff's retaliation claim.  *See Pannell v. Nicholson*, No. 7:06cv00088, 2008 WL 565098, at *5 (W.D.Va. Feb. 29, 2008) (finding that leave restriction, which required plaintiff "to produce medical documentation in order to take sick leave, was required to request annual, paid leave in advance, and would face disciplinary action if his pattern of absences continued," was not an adverse employment action; even if it were, plaintiff failed to demonstrate a causal link between his discrimination complaint and leave restriction); *Maxwell-Perkins v. Principi*, No. 02 CV 2878, 2003 WL 21148556, at *9 (N.D. Ill. May 19, 2003) (finding that placement on sick leave restriction, which "merely required Plaintiff

to comply with an additional procedural requirement and did not materially alter her terms or conditions of employment," was not an adverse employment action); *Doss v. Martinez*, No. 00CV0267, 2001 WL 493166, at *10 (N.D. Tex. May 4, 2001) (finding that "Leave Restriction was not an ultimate employment decision and, therefore, was not an adverse employment action"); *see also Hutchinson v. Holder*, 668 F. Supp. 2d 201, 217-18 (D.D.C. 2009) (requirement that plaintiff communicate sick leave requests directly to supervisor instead of normal procedure of communicating such requests to a co-worker did not constitute adverse action).

Even if the leave restriction were an adverse employment action, plaintiff's retaliation claim fails in the face of defendant's legitimate, nondiscriminatory reason for its imposition. Defendant has demonstrated a pattern of using unscheduled leave to extend her weekends, with plaintiff taking off Fridays and Mondays in addition to a regular day off during a two-week period as her alternative work schedule permitted, at a time when the Section 508 Program was failing. Such conduct, defendant shows, was a valid reason for placing an employee on a leave restriction. Plaintiff is unable "to produce sufficient evidence that would discredit those reasons and show that the actions were retaliatory." *Baloch*, 550 F.3d at 1200; *see Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011) ("Generally speaking, a claim should proceed to the jury if the plaintiff is able to point to evidence from which a jury could reasonably find that the employer's stated reasons for the challenged employment action were pretextual.").

At most, plaintiff demonstrates a temporal relationship between her EEO complaint and the leave restriction, *see* Pl.'s Opp'n at 2, 6, 10, 13-16; Mot. for Summ. J. [Dkt. #13], Ex. Z (Timeline) at 1, but timing alone does not prove that defendant took the action because she filed

an EEO complaint. *See Glass v. LaHood*, No. 08-01516, 2011 WL 1930669, at *30 (D.D.C. May 20, 2011) (rejecting plaintiff reliance "upon the temporal proximity between her protected activity"); *Pendleton v. Holder*, 697 F. Supp. 2d 12, 23-24 (D.D.C. 2010) (granting summary judgment for employer where plaintiff's "*only* evidence of retaliation is the temporal proximity between his protected activity and his non-selection" for a position (emphasis in original)). "[P]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine," *Woodruff v. Peters*, 482 F.3d 521, 538 (D.C. Cir. 2007), and aside from plaintiff's conclusory assertions of retaliation, nothing in her submissions rebuts defendant's showing. *See Gaskins v. Williams & Connelly LLP*, __ F. Supp. 2d __, __, 2011 WL 1485370, at *8 (D.D.C. Mar. 31, 2011) (granting summary judgment for employer where plaintiff "offers nothing but conclusory allegations in response to the non-retaliatory reasons asserted" for denying plaintiff an opportunity for promotion and a lower raise); *Dawson v. Reukauf*, 751 F. Supp. 2d 146, 152 (D.D.C. 2010) (granting summary judgment for employer on retaliation claim where plaintiff "relies only on her own conclusory statements, none of which overcome the reasons [the employer] has described for the employment decisions at issue here"); *Meadows v. Mukasey*, 555 F. Supp. 2d 205, 211 (D.D.C. 2008) (concluding that two leave restriction letters "were all the result of Plaintiff's excessive and unpredictable absences from work").

Similarly, placement on AWOL status for one day cannot sustain plaintiff's retaliation claim. She fails to demonstrate that this one-time event had materially adverse effects on the terms or conditions of her employment, or would have dissuaded a reasonable employee from pursuing an EEO complaint. Moreover, plaintiff offers nothing to counter defendant's legitimate

non-discriminatory reason for concluding that, once she requested sick leave and failed to provide proper medical certification for her absence, she violated the terms of the leave restriction.

### b. Opportunity to Demonstrate Performance

Notwithstanding defendant's assertion to the contrary, *see* Def.'s Mem. at 37 ("Although the ODP potentially could have led to a material adverse action, . . . [it] was designed to avoid such an adverse action by giving [plaintiff] an opportunity to improve her job performance so that she would not be subject to any adverse action."), the Court finds that the ODP may be considered a materially adverse action for purposes of raising a retaliation claim. *See Kelly v. Mills*, 677 F. Supp. 2d 206, 226 (D.D.C. 2010) (considering placement on Performance Improvement Plan ("PIP") as an adverse action for purposes of retaliation claim); *Chowdhury v. Bair*, 604 F. Supp. 2d 90, 96-97 (D.D.C. 2009) (holding that placement on a PIP was materially adverse in the context of a retaliation claim); *see also Beckford v. Geithner*, 661 F. Supp. 2d 17, 23 (D.D.C. 2009) (noting employer's concession that "minimally successful performance appraisal constituted a materially adverse action" because it may have temporarily affected future employment opportunities).

Plaintiff's claim still fails, however, in the face of defendant's legitimate, non-discriminatory reasons for the ODP. Plaintiff "started the [Section 508] program from nothing," Def.'s Mem., Ex. 1, at 33:6-7, and the record shows that the program was plaintiff's sole responsibility. The "goal was to make sure that 80 percent of [the registered] websites . . . met [Section 508] compliance requirements, and [plaintiff's] responsibility was to make that happen." Def.'s Mem., Ex. 1 (Vol. 2) at 170:6-10.

Defendant demonstrates the program's progressive failure in the months preceding the ODP, as well as plaintiff's failure to meet the goals she and her superiors (who preceded Ms. Young) established for her performance, culminating in the Section 508 Program's failure for Fiscal Year 2006. Once again, the Court is left with plaintiff's unsupported assertions which fail to establish that her employer imposed the ODP in retaliation for her prior protected activity.

c.     Detail and "Demotion"

Plaintiff points to the offer of a detail, which she construed as a demotion, as retaliation for having filed an EEO complaint. Although, for example, "reassignment with significantly different responsibilities . . . generally indicates an adverse action," *Forkkio*, 306 F.3d at 1131, plaintiff cannot demonstrate that the offer of a detail, whether a demotion or not, rises to the level of an adverse action supporting a retaliation claim. Plaintiff did not choose a detail, and in these circumstances the Court cannot conclude that the detail materially affected the terms or conditions of her employment.[9]

D.     Hostile Work Environment

It is unlawful to "requir[e] people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). A workplace which "is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working

---

[9]In her complaint, plaintiff lists other examples of retaliatory acts, including Ms. Young's alleged failure to comply with agency policy regarding counseling statements, looking for a four-year-old desk audit as a basis for concluding that plaintiff was not performing at a GS-15 level, and opposing plaintiff's unemployment compensation claim. *See* Compl. at 3. Absent any showing that these alleged actions either altered the terms or conditions of plaintiff's employment or would have dissuaded a reasonable employee from pursuing an EEO claim, none is an adverse employment action which could support a discrimination claim.

environment,'" *id.* (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986)), violates Title VII. *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003). The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Balach*, 550 F.3d at 1201. Isolated incidents do not form a hostile work environment claim. *See Ramey v. Potomac Elec. Power Co.,* 468 F. Supp. 2d 51, 58 (D.D.C.2006) ("One incident – though reprehensible if true – does not a hostile work environment make."). Rather, "a plaintiff must demonstrate that the alleged events leading to the hostile work environment were connected, since discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult." *Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 103 (D.D.C. 2010) (citations and internal quotation marks omitted).

It is apparent that plaintiff and Ms. Young did not enjoy a cordial relationship. Nothing in the record suggests, however, that plaintiff endured intimidation, ridicule, insult, or other behavior that was offensive, pervasive, severe, or abusive. Instead, it appears that plaintiff's grievances pertain to Ms. Young's management style, and such assertions cannot support a hostile work environment claim. *See Allen v. Napolitano,* __ F. Supp. 2d __, __, No. 09-2228, 2011 WL 1192943, at *14 (D.D.C. Mar. 31, 2011) (finding that "the majority of plaintiff's

complaints relate to her immediate supervisor's management style," and "[b]eyond alleging less-than-ideal working conditions, plaintiff has not made sufficient allegations that defendant severely or pervasively altered and interfered with her employment"); *Johnson v. Bolden*, 699 F. Supp. 2d 295, 302 (D.D.C. 2010) ("[N]early all of plaintiff's allegations of a hostile work environment, even if taken as true, amount to nothing more than plaintiff's objections to the management style of [supervisors in] his chain of command"). Plaintiff's hostile work environment allegations "amount to instances where [she] disagreed with the management style of those who supervised [her] – and that alone is not actionable under Title VII." *Thorn v. Sebelius*, __ F. Supp. 2d __, __, No. 10-0299, 2011 WL 344127, at *12 (D. Md. Feb. 1, 2011) (citation omitted).

There must be a "linkage between the hostile behavior and the plaintiff's membership in a protected class" for a hostile work environment claim to proceed, *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) (citations omitted). Plaintiff, however, fails to make the connection. Wholly absent from plaintiff's submissions is any evidence from which a reasonable jury could conclude that the alleged adverse employment actions were taken because of her race, sex, or prior protected activity. In fact, plaintiff's entire case is based on her own conclusory allegations which, even taken together, do not demonstrate "offending behavior" that is "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Vinson*, 477 U.S. at 67; *see Dawson*, 751 F. Supp. 2d at 152 (rejecting hostile work environment claim where plaintiff "merely asserts, based solely upon her own statements, that she was "subjected to frequent harassment and hostile actions.").

"Hostile work environment claims are not meant to set a general code for the workplace." *Ramey*, 468 F. Supp. 2d at 58 n.8. "Even an employee who reports discriminatory behavior is not immunized from those petty slights or minor annoyances that often take place at work and that all employees experience." *Kelly v. Mills*, 677 F. Supp. 2d 206, 222 (D.D.C. 2010) (citation and internal quotation marks omitted). Plaintiff cannot convert "ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, into an actionable hostile work environment claim. Her failure to allege facts or produce any evidence of conduct so frequent, severe, offensive or intense as to "change . . . the terms and conditions of her employment," *id.*, will result in summary judgment being granted for the defendant on this claim. *See Hendricks v. Paulsen*, 520 F. Supp. 2d 65, 89 (D.D.C. 2007) (dismissing hostile work environment claim where no evidence tied denial of promotion, reprimand, or performance critique to plaintiff's race or gender or retaliation); *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) (finding that plaintiff who endured attacks on personal integrity and whose supervisor spoke to her in a "belittling tone" did not "satisfy the required elements of her racially hostile work environment claims").

**E.        Constructive Discharge**

Although a resignation is presumed to be voluntary, "[i]n certain cases, the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (analyzing constructive discharge claim in civil action alleging discrimination based on age). In this Circuit, "a 'finding of constructive discharge depends on whether the employer deliberately

made working conditions intolerable and drove the employee' out." *Mungin v. Katten Muchin &*
*Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1173
(D.C. Cir. 1981)).  To be actionable, a constructive discharge claim "requires a showing that (1)
intentional discrimination existed, (2) the employer deliberately made working conditions
intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option
but to end her employment."  *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 81 (D.D.C.
2009).  An employee who "leaves an unpleasant but objectively tolerable job because
alternatives have become more attractive, even if the employer's misbehavior creates the
unpleasantness," does not allege a viable constructive discharge claim.  *Taylor v. Fed. Deposit*
*Ins. Corp.*, 132 F.3d 753, 766 (D.C. Cir. 1997).

"A hostile-environment constructive discharge claim entails something more: A plaintiff
who advances such a compound claim must show working conditions so intolerable that a
reasonable person would have felt compelled to resign."  *Pa. State Police v. Suders*, 542 U.S.
129, 134 (2004).  Under a constructive discharge theory, liability extends "to employers who
indirectly effect a discharge that would have been forbidden by statute if done directly."
*Simpson v. Fed. Mine Safety & Health Review Comm'n*, 842 F.2d 453, 461 (D.C. Cir. 1988).
Generally, "facts necessary to prove a hostile work environment are a subset of those necessary
to prove . . . constructive discharge" premised upon a hostile work environment.  *Steele v.*
*Schafer*, 535 F.3d 689, 694 (D.C. Cir. 2008).

It is unclear whether plaintiff pursues a constructive discharge claim only or a
constructive discharge claim arising from a hostile work environment.  She cannot prevail under
either theory, however, as nothing in the record supports an argument that the conditions of

plaintiff's employment had become intolerable.  Plaintiff found herself with a new supervisor

who monitored the progress of the one program for which plaintiff was principally responsible,

who made plaintiff "uncomfortable," and whose management style plaintiff did not like.  This

supervisor took action when she noticed plaintiff's frequent unscheduled absences and her poor

performance in managing the Section 508 Program.  Neither the leave restriction nor the ODP

demonstrates intolerable working conditions which would compel a reasonable person to resign,

no matter how infuriating, unjustified or retaliatory plaintiff believed them to be.  *See Gaskins*,

2011 WL 1485370, at *10 (rejecting constructive discharge claim which "rests entirely on

vague, conclusory allegations in [plaintiff's] amended complaint and her declaration"); *Bryant v.*

*Pepco*, 730 F. Supp. 2d 25, 32 (D.D.C. 2010) (dismissing constructive discharge claim in part

because of plaintiff's "fail[ure] to plead any additional facts to demonstrate that he was subjected

to 'intolerable working conditions'").

### III.  CONCLUSION

Assuming that plaintiff adequately stated claims for discrimination based on race and sex

and retaliation, hostile work environment and constructive discharge, she fails to rebut the

legitimate non-discriminatory reasons for defendant's decision to impose a leave restriction,

place her on AWOL status for one day, put her on a 90-day ODP plan, and propose, among other

options, a detail to a DOT employee at a lower grade level.  Accordingly, the Court grants

defendant's motion to dismiss and for summary judgment.  An Order accompanies this

Memorandum Opinion.


                                    _____/s/_____
                                    ELLEN SEGAL HUVELLE
                                    United States District Judge

DATE:  June 22, 2011